**GRANVILLE GOLD TRUST–SWITZERLAND, Granville Gold Switzerland Corp., and Abdul Hafeez Muhammad, Plaintiffs,**

v.

**COMMISSIONE DEL FULLIMENTO/INTER CHANGE BANK, Ufficio Di Esecuzione e Fallimenti/Inter Change Bank, Defendants.**

No. CV–95–0619.

United States District Court,
E.D. New York.

April 23, 1996.

 

Steven H. Gifis, Pennington, NJ, Richard R. Rio, Goldman & Rio, New York City, For Plaintiffs.

Paul Bschorr, Dewey Ballantine, New York City, For Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

Defendants have moved to vacate a default judgment in excess of one-hundred and twenty-five billion dollars and to dismiss the complaint. Plaintiffs have cross-moved for leave to file an amended complaint. At a hearing on February 28, 1996, this court vacated the default judgment that had been entered by the Supreme Court of the State of New York, but reserved decision on the other two motions which this opinion will now address.

## Background

### (1)

According to plaintiffs, Robert Granville Higgins created plaintiff Granville Gold Trust–Switzerland (GGT) in March 1966, naming Inter Change Bank (ICB), a Swiss entity, as trustee.[1] Pltffs' Mem. at 24. Under this trust, ICB had rights, powers, duties and obligations under the applicable laws of California, except that the laws of Switzerland would apply to issues relating to "performance" and to "all financial transactions." Doc. No. 21A at 3. The trust was nominally established for charitable purposes including, in the event any annual donations are made by the Trust, a ten percent interest to the Jesuit Order of the Roman Catholic Church for educational purposes throughout the world and a ten percent interest for the "Shrine [sic] Crippled Children" program throughout the world. However, there were two notable non-eleemosynary beneficiaries—the estate of Robert Higgins' brother, G. Sterling Higgins, and "[s]uch other beneficiaries as TRUSTOR may from time to time select...." Id. It should also be pointed out that the trust agreement, dated March 26, 1966, is signed only by Robert Higgins and not ICB, but it will be assumed for purposes of deciding these motions that at some point ICB did sign the agreement.

Robert Higgins claims that he met with representatives of ICB in New York City in 1966 in order to establish the trust. Higgins' Certification, dated 9/12/95, ¶ 6. Further, Higgins attests that he made an initial deposit of $200 at that meeting, Higgins' Certification ¶ 8, and subsequently deposited additional cash, gold certificates, and other assets allegedly amounting to over $600,000,000 in value. Id. at ¶ 9. See Compl. at ¶¶ 8–9. The source of these funds allegedly was the estate of G. Sterling Higgins, Robert Higgins' brother.[2] Pltffs' Mem. at 24.

ICB is not a named defendant in this case. ICB was a Swiss incorporated bank located in Chiasso, Switzerland in the Canton of Ticino. The bank was under the supervision of the Federal Banking Commission and the Swiss Investment Trust Law of July 1, 1966. Pltffs' Mem. at 12.

ICB was placed into bankruptcy by the Canton of Ticino's civil court of appeals on September 27, 1967. Hirsch Aff. ¶ 4. As was general Swiss practice, the Ticino Court of Appeals then appointed three commissioners to supervise ICB's liquidation, referred to

---

1. Plaintiff Granville Gold Switzerland Corporation is a North Carolina corporation authorized to transact business in New York with its principal place of business on East 54th Street, Brooklyn, New York. Pltffs' Mem. at 12. Plaintiff Abdul Hafeez Muhammad is the director and president of the corporation. Id. It is not clear why the corporation is a party to the case.

2. G. Sterling Higgins died intestate in a California prison in 1961, Baumwald Aff. ¶ 19, Doc. No. 18, and his total estate amounted to less than $5,000 according to the State of Washington taxing authorities. Baumwald Aff. ¶ 20–21, Doc. Nos. 19–20. Plaintiffs contend that G. Sterling Higgins' estate was never settled properly, Muhammad's Second Supplemental Affidavit at ¶ 10, due to ICB's refusal to supply information about the trust assets. Higgins Certification at ¶ 14.

as the "Commissione Del Fullimento." (Commissione.) *See* Article 36, ¶ 2 of Swiss Banking Act of 1934; Ltr. from Swiss Embassy to Court, dated 1/22/96, at 2. Over the course of the twenty-two years it took to wind up matters, the composition of the Commissione changed. Ultimately, it appears that at least six individuals served as commissioners. Tognola Aff. ¶ 11; Doc. No. 48. The Commissione was disbanded on August 23, 1989 when the Ticino Court of Appeals approved the liquidation and settlement and the proceedings were completed. Defs' Mem. at 5; Doc. No. 47. Also, "ICB was canceled from the rolls of the registry of commerce in 1989." Defs' Mem. at 6.

According to the plaintiffs, the proceedings took so long for a number of reasons. Pltffs' Mem. at 31 (citing defendants' affidavits). First, ICB had many small creditors who were located outside of Switzerland, particularly in Italy and South America. Second, in order to realize ICB's assets, the Commissione had to challenge public authorities and squatters in Venezuela where the most significant of ICB's assets were located. Gaja Aff. ¶ 6; Tognola Aff. ¶¶ 8–9. Third, several of ICB's directors were criminally prosecuted; three were convicted. *Id.* Civil actions were then commenced by the Commissione against former ICB directors. Tognola Aff. ¶ 9.

The Commissione was responsible for identifying and collecting the assets of the ICB, establishing a list of the bank's depositors and creditors, and disbursing the remaining assets of the ICB equitably among the list of depositors and creditors according to Swiss law. Gaja Aff. ¶¶ 9–10; Doc. Nos. 40 & 47; Tognola Aff. ¶¶ 4, 7–8, & 10; Doc. No. 46. "The claims contained in the books and records of the bank at the time of the bankruptcy [were] deemed lodged." Defs' Mem. at 25, n. 83.

In 1967, Dr. Alberto Bernasconi, who served as the special receiver of ICB for five months until the Court of Appeals of Ticino created the Commissione and was, subsequently, a member of the original Commissione until 1970, prepared a report setting forth all known creditors of ICB, including all depositors and customers having claims against ICB's assets. None of the plaintiffs nor Robert Higgins was included on the list. Bernasconi Aff. ¶ 3; Doc. No. 39. Bernasconi later explained in an affidavit filed in this proceeding:

> As special receiver in 1967, one of my principal responsibilities was, as an auditing function, to prepare a report setting forth all assets and liabilities of the bank, including known creditors depositors and other customers having claims against the assets of ICB. I have recently reviewed the 121 page report plus balance-sheet I prepared. The review of the original report confirms my recollection that neither Granville Gold Trust Switzerland, Granville Gold Switzerland Corporation, Robert Higgins or Abdul Hafeez Muhammad, or indeed any name similar thereto, were included in the list of depositors, creditors or customers. *Id.* at ¶ 3.

Plaintiffs maintain that on October 12, 1967 Robert Higgins wrote to Dr. Bernasconi requesting that Bernasconi transfer all the assets, deeds and titles, certificates, and papers of the GGT to the Credit Suisse Bank. The Commissione did not turn over the assets or otherwise respond to Higgins' request. Higgins' Certif. ¶ 10. In addition, plaintiffs maintain, at nearly the same time, on October 16, 1967, Higgins wrote to Mr. Jack Smith at the United States Embassy in Bern, Switzerland asking for help in recovering the assets deposited in trust with the ICB. Pltffs' Mem. at 32; Higgins' Certif. ¶ 10; Ex. A–7 to August 21—Report. This effort too was "in vain." Pltffs' Mem. at 33.

Apparently, for the next ten years no further actions were taken by Robert Higgins or anyone else to recover the alleged assets of the trust. In 1977, apparently, Higgins wrote a series of letters to Bernasconi and Campana informing them that he had opened a trust in 1966 which had in it the equivalent of six hundred million dollars. Campana Aff. at ¶ 8. No further actions were then taken for the next twelve years. In June 1990, Higgins appointed plaintiff Abdul Hafeez Muhammad "principal beneficial interest holder of GGT." *Id.* at 33. Higgins irrevocably appointed Muhammad to assemble and

restore the assets of GGT. Muhammad Aff., dated 9/13/95, ¶ 2.

### (2)

The second named defendant, Ufficio di Esecuzione e Fallimenti (Ufficio), is an administrative unit of the Canton of Ticino responsible for administering bankruptcy matters relating to non-banking entities. Hirsch Aff. ¶ 12. It had no involvement with the liquidation of ICB. Defs' Mem. at 6; Hirsch Aff. ¶¶ 14b, 27. This defendant was not originally named by the plaintiff, but was added in an amended complaint in state court, filed February 17, 1993, which, however, added the name of the Ufficio di Esecuzione e Fallimenti only to the caption and to the first paragraph of the complaint. In supplemental papers, plaintiffs explain that in June 1993 Muhammad visited Switzerland in order to determine the status of the trust; he was referred to the Ufficio's office. Muhammad 1st Supp. Aff., dated 2/1/96, ¶¶ 2–3. At the Ufficio, he found all of the documents relating to ICB's bankruptcy. Consequently, plaintiffs maintain that the Ufficio had some involvement in the bankruptcy proceeding, and thus, it, too, could be liable for conversion of trust assets. *Id.* at 4.

### (3)

Plaintiffs, GGT, Granville Gold Switzerland Corporation, and Muhammad, originally brought this action in New York State Supreme Court on February 25, 1993, claiming that ICB or the Commissione or the Ufficio converted the assets of a trust that the bank held. Compl. ¶¶ 20–22. Specifically, plaintiffs claim that defendants owed them a sum in excess of six hundred million dollars with interest compounded at one percent per week from 1966, thereby totaling approximately one-hundred and twenty-five billion dollars at the time of the filing of the complaint in state court. Compl. ¶¶ 14–16.

The summons was addressed to the Commissione at ICB's former address. On June 8, 1993, Dr. Rene C. Pedretti, a Swiss lawyer retained by plaintiffs, Muhammad 2d Supp. Aff. ¶¶ 10–12, sent a letter in Italian to the Commissione at the Ufficio's address enclosing a copy of the complaint in English. Doc. No. 49. Defendants argue that not only was this improper service, but also that Pedretti,

himself, did not intend this to be service, as he stated that letters rogatory, a necessity for proper service in Switzerland, would follow. *Id.* Muhammad maintains that Pedretti spoke to an unidentified member of the Ufficio who "had no objection to receiving judicial papers by mail and g[a]ve approval and authorization to do so by the Swiss law firm of, Ferrari–Pedretti, Lugano Switzerland." Muhammad 2d Supp. Aff. ¶ 12. Pedretti, himself, however, stated in a letter dated February 23, 1995 to Luca Beretta Piccoli, the director of the Division of Justice of the Republic and Canton of Ticino, that he did not intend his actions to act as formal service of process. Beretta Piccoli Aff. ¶ 6.

The Ufficio sent the letter to the Court of Appeals of the Canton of Ticino as the suit involved its appointee, the Commissione, which was no longer in existence. Caimi Aff. ¶ 3; Doc. No. 50. The Ticino Court of Appeals responded both to the Ufficio and to Pedretti that service was improper as it did not conform either to Swiss law or any recognized international convention, and that all documents should be returned to Pedretti. Doc. No. 52. Plaintiffs maintain that defendants chose not to respond to the complaint, but were "fully aware" of the summons and complaint. Pltffs' Mem. at 16.

Defendants contend that no further attempts at service were made, Defs' Mem. at 16, while plaintiffs argue that additional attempts to serve were made during February and March 1994 by Dr. Paul Gmuer, an attorney in Zurich. Pltffs' Mem. at 16. On February 28, 1994, Gmuer sent by Swiss registered mail the English summons and complaint to the Ufficio along with a German cover letter. The Ufficio, as it had with Pedretti, returned the contents of the letter to Gmuer on March 1, 1994. Doc. No. 55. On March 2, 1994, Gmuer sent an almost identical letter and enclosures to Dr. Enzo Tognola, a former member of the Commissione. Doc. No. 56. Tognola forwarded the letter and enclosures to another former commissioner, Bernasconi. Bernasconi wrote to Gmuer on March 4, 1994 that the Commissione had been disbanded since the bankruptcy proceeding had concluded and that Gmuer's clients were "never reported as

creditors" and thus were not on the distribution lists. Doc. No. 57. Gmuer also did not intend his letters to be construed as formal service.

"[O]n 9 February 1995, the Counsel of State wrote to Dr. Gmuer to confirm that the transmittal of documents on 25 March 1994 was not intended as formal service. On 17 February 1995, Dr. Gmuer responded to our letter ... stat[ing]: 'My letters with enclosures to the Ufficio in Mendrisio as well as to Dr. Enzo Tognola in Locarno ... were sent as clearly expressed in the texts, exclusively on request and on behalf of plaintiff parties and not of a foreign court.... To them my view, too, was made known that a judgment, if any, of the New York court resorted to would have no chance of being recognized and enforceable in Switzerland.'"

Beretta Piccoli Aff. ¶ 8.

Defendants did not appear in the New York State case. On March 18, 1994, plaintiffs filed an amended notice of motion in the New York State Supreme Court, Kings County, seeking a default judgment against both the Commissione and the Ufficio. Doc. No. 24. Gmuer again sent a letter in German along with the English amended notice of motion to Tognola who again sent it to Bernasconi. Doc. No. 58.

The state court issued a default judgment on May 5, 1994. Doc. No. 28. On May 13, 1994, the Ufficio received a copy of the judgment in English directly from the state court. Doc. No. 60. On August 2, 1994, Justice Gerald Held settled the order for an inquest. Gmuer sent to Tognola a copy of the order in English and a German letter advising Tognola of its contents on August 15, 1994. Doc. No. 63. Tognola responded on August 18, 1994 returning the documents and warning

that "possible future mailings of the same nature will be returned to your office without having been opened." Doc. No. 64. In September, Gmuer attempted to mail a copy of the notice (in English) that an inquest would be held to Tognola. It was returned to him. Doc. No. 65 & 66. On October 3, 1994, Justice Held entered a default judgment in the amount of $125,444,300,221.00. Doc. No. 32. Gmuer mailed a copy of the judgment in English to Tognola which he returned as well. Doc. No. 67 & 68.

On December 23, 1994, plaintiffs served restraining notices on various financial institutions including the Federal Reserve Bank of New York, seeking to restrain the Ufficio's and the Commissione's funds, as well as the funds of the Swiss Canton of Ticino, all other Swiss cantons, the National Bank of Switzerland, all Swiss banks and the Confederation of Switzerland up to the amount of the default judgment. Bschorr Aff. ¶ 15; Doc. No. 33. Information subpoenas were likewise served on various financial institutions. Id. ¶ 16; Doc. No. 34.

On January 3, 1995, the Federal Reserve Bank by Order to Show Cause, sought an injunction against plaintiffs in the Southern District of New York. Judge Peter K. Leisure issued the order that day. Bschorr Aff. ¶ 17; Doc. No. 35. Judge Leisure entered a temporary restraining order later that day, preventing plaintiffs from enforcing the restraining notices or information subpoenas. The TRO still remains in effect. Bschorr Aff. ¶ 18; Doc. No. 36.

The Canton of Ticino, on behalf of the Ufficio and the disbanded Commissione, retained counsel to protect its interests in January 1995. Pursuant to 28 U.S.C. § 1441(d), a notice of removal was filed on February 14, 1995,[3] and defendants brought this motion to

---

3. Although, normally, a defendant must remove within thirty days of notice of the action, 28 U.S.C. § 1446(b), plaintiffs have not questioned the timeliness of the removal. See 28 U.S.C. § 1441(d) (making an exception to the thirty day time limit "for cause shown"); *Gray v. Permanent Mission of the Peoples Republic of the Congo*, 443 F.Supp. 816, 820–21 (S.D.N.Y.), *aff'd*, 580 F.2d 1044 (2d Cir.1978) (finding that an action brought in state court seven months before a notice of removal was filed could still be removed as: (1) the defendant was a foreign state;

(2) service as required under the Foreign Sovereign Immunity Act was not complied with; and (3) the summons and complaint that the defendants' agents did receive was in English which they could not understand); *Refco, Inc. v. Galadari*, 755 F.Supp. 79, 84 (S.D.N.Y.1991) (in an action involving receivers appointed by a sovereign state, the court held that even after a five year delay in removing the case "good cause has been shown [for removal] because of the importance of this case being in federal court to effec-

vacate the state default judgment and to dismiss this action.

On February 28, 1996, this court vacated the default judgment, following Federal Rule of Civil Procedure 60(b). The serious and complex issues of proper service, jurisdiction and comity in this international litigation, combined with the enormity of the judgment, the very existence of which threatened to create havoc in the financial markets—even if the judgment were subsequently held void—made a compelling case for resolving the issues on the merits and not via a default judgment. Hearing Tr. at 7. *See Klein v. Williams,* 144 F.R.D. 16 (E.D.N.Y.1992) (vacating default because of lack of proper service); *Forum Ins. Co. v. McNerney,* 1991 WL 207549 (S.D.N.Y. Oct. 3, 1991) (vacating default because defective service renders judgment void).

### (4)

As previously mentioned, the trust was opened with an initial deposit of $200. Plaintiffs maintain that deposits were made thereafter, "authenticated through a 'balance sheet of Granville Gold Trust as of September 14, 1966' prepared by J.C. Plummer, an accountant"[4] for GGT. Pltffs' Mem. at 26. Exhibit A–I to August 21—Report.

Plaintiffs maintain that ICB verified the "presence of substantial assets in the Granville Gold Trust, under the control of ICB as trustee." Pltffs' Mem. at 27. Telegrams were sent by ICB to various individuals, including Fred World, William Burris, Jacob Reuben, and Nat Rosenberg, in August and September of 1966 verifying the presence of "considerable *documents* on deposit" as well as issuing letters to potential trust depositors. *See* Ex. A, Telegram dated 8/30/66 sent to Billingsley. (Emphasis supplied.) In these letters to potential contributors, it appears that ICB relied upon the financial statements prepared by Plummer which reflected the trust's net worth "in excess of 200 million dollars." Pltffs' Mem. at 28, Ex. A–2.

On February 24, 1994, former counsel to ICB, Pierfrancesco Campana, wrote to Muhammad stating:

I was the liquidator for Inter Change Bank, Chiasso Switzerland and was in charge of all agreements with the bank and its customers, and having knowledge of all deposits and assets accepted by Inter Change Bank in trust accounts. Regarding your inquiry on Granville Gold Trust, I have first hand knowledge the Granville Gold Trust assets in 1966 being indicated were in excess of $US 600 Million and were comprised of and not limited to the following assets: real estate mining properties with indicated and referred in-ground and above-ground precious metals, gold and silver certificates trust production notes and other personal properties.

Ex. A–32, 33 and 34 to August 21—Report.

Although Campana verified his knowledge of the alleged $600 million on deposit in the trust in an undated affidavit submitted to this court in support of plaintiff's motion, his recollection is not quite the way plaintiffs describe it.

According to his later affidavit, submitted for the defendants, not only were plaintiffs not creditors, depositors or customers included on the 1967 list compiled by Bernasconi, but also Campana had no personal knowledge of the alleged deposit. Rather Campana relied upon the facts claimed by Muhammad in his letter to Campana requesting Campana to create an affidavit for the plaintiffs when he wrote the February 24 letter quoted above. In addition, in his later affidavit for the defendants, he explained that the

---

tuate the purpose and intent of the Foreign Sovereign Immunity Act in creating a uniform body of law and the fact that no substantial proceedings have taken place in state court.").

**4.** Plummer, GGT's accountant, prepared a report which tabulated total assets of $589,920,300 and total current liabilities of $79,293,621, for a total net worth at the time of $510,626,679. Pltffs' Mem. at 26. Current assets consisted of $76,000 cash, $4,260,000 gold in transit, and $20,000,000 cash in transit for total current assets of $24,-276,000. The trust contained fixed assets of $565,644,300, which included raw above ground ores valued at $158,700,000, processed ores at $159,000,000, assigned gold certificates at $21,-500,000, capital value Granville western mines worth $95,716,800, net management coordinators valued at $56,315,000, and net management trust worth $77,293,500. Pltffs' Mem. at 26.

box of certificates in his office did not belong to Granville, but were issued <u>by</u> Granville:

> According to my recollection and upon review of the corresponding relevant documents, I can confirm that neither Granville Gold Trust Switzerland, Granville Gold Switzerland Corporation, Robert Higgins or Abdul Hafeez Muhammad, was included in the list of depositors, creditors or customers contained in the report setting forth all assets and liabilities of ICB, previously prepared in 1967 by the special receiver ... Bernasconi. Furthermore, after the publication of the commencement of the bankruptcy proceedings in the Cantonal Gazette (on October 20, 1967), the above mentioned entities or natural persons never lodged any creditor's claims against ICB .... It is my recollection that there was at ICB's offices a large box containing certificates issued by Granville Gold Trust itself. *I emphasize: not certificates belonging to Granville but issued by Granville itself, ... I could not say how many they were. I remember that Angelo Maternini, a former director of ICB, had told me that said Granville certificates had been deposited with ICB since Granville Gold Trust had in mind to obtain a loan by ICB which, of course, ICB never granted. I further recollect that ICB was never holding any assets, of any nature whatsoever, that belonged to Granville or that Granville had deposited with ICB other than its own certificates.* Campana Aff. ¶¶ 6-7. (emphasis added.)

Furthermore, in his later affidavit, Campana points out that the letter he wrote to Muhammad on February 24, 1994 contained errors:[5]

> About the contents of this letter I need to point out that its text is not fully accurate because: I have never had any personal knowledge that Granville Gold Trust's assets were in excess of US $600 Mio; [and] I have never had any personal knowledge about the nature, the quality and the value of the assets assertedly held by Granville Gold Trust. The indications to this re-

spect were originating from the draft in handwriting submitted to me by Mr. Muhammad on February 24, 1994 in order to get my help ...." Campana Aff. ¶ 13.

Defendants maintain that neither the plaintiffs nor Higgins had a trust with ICB. They contend that "plaintiffs' only 'evidence' of such a depositor trust relationship is a copy of what purports to be a 1966 agreement attached to the complaint. This 'agreement' was not signed by ICB." Defs' Mem. at 27. According to defendants, no record of any "assets" being deposited by plaintiffs exist. Campana Aff. ¶¶ 6-7. Campana recollects that there was a box containing certificates issued by, not belonging to, GGT. *Id.* at ¶ 7. These certificates were kept in Campana's office until returned to Muhammad at his request in 1993. Campana's Aff. ¶ 12.

### Discussion

Defendants request that the case be dismissed for at least nine reasons: (1) lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunity Act; (2) lack of in personam jurisdiction; (3) comity; (4) the need to accord deference to a foreign bankruptcy proceeding; (5) immunity of the Commissione as it acted in a quasi-judicial capacity; (6) official acts of a foreign state cannot be considered by United States' courts pursuant to the act of state doctrine; (7) improper and ineffective service of process; (8) improper venue; and (9) statute of limitations. Plaintiffs, in turn, request an opportunity to amend their complaint to add the individual commissioners as defendants. In addition, defendants seek Rule 11 sanctions against the plaintiffs. Only one of defendants' arguments need be addressed inasmuch as it is evident that subject matter jurisdiction is lacking in this matter and cannot be remedied by any amendment of the complaint.

 Because a decision on this motion to dismiss on subject matter jurisdictional grounds requires this court to consider questions of fact, the most significant of which is

---

5. Similarly, Campana notes that on December 5, 1994, he signed another affidavit that Muham-

mad drafted which contains other inaccuracies. Campana Aff. ¶ 14.

the content of Swiss law,[6] the motion to dismiss will be converted into a summary judgment motion and considered under a summary judgment standard. *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988); *Equal Employment Opportunity Commission v. New Cherokee Corp.,* 829 F.Supp. 73, 77 (S.D.N.Y.1993). *See also Signorelli v. New York State Board of Elections,* 1995 WL 548712 (N.D.N.Y. Sept. 11, 1995).

### (1) Subject Matter Jurisdiction

The exclusive basis for federal court jurisdiction over suits against a foreign sovereign is the Foreign Sovereign Immunity Act (FSIA). 28 U.S.C. § 1602. A court lacks subject matter jurisdiction over the sovereign unless one of the exceptions explained in 28 U.S.C. §§ 1605–1607 applies.[7] 28 U.S.C. § 1604.

#### (a) "agency" or "instrumentality" of a foreign state

A "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state" which is defined as:

> any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof ..., or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a state of the United States ... nor created under the laws of any third country. 28 U.S.C. § 1603.

The legislative history of the FSIA is clear that the term "agency or instrumentality" should be interpreted broadly, *see Refco, Inc. v. Galadari,* 755 F.Supp. 79, 82 (S.D.N.Y. 1991) citing H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613. In *Refco,* 755 F.Supp. at 82, the court found that there was no "dispute that [a Committee of Receivers charged with "winding up the affairs" of the business] is an 'agency or instrumentality'" under the FSIA because, *inter alia,* the committee was created by governmental order and was established to prevent the loss of additional assets of the business. Similarly, in *Chuidian v. Philippine National Bank,* 912 F.2d 1095, 1103 (9th Cir.1990), the Court of Appeals found that an individual member of a commission created by the executive branch, to recover "ill-gotten wealth" accumulated by the former President of the Philippines Ferdinand Marcos and his associates, was immune to suit in American courts under the FSIA.

In this instance, it is undisputed that the second named defendant, the Ufficio, is a Swiss governmental entity in the Canton of Ticino charged with the administration of bankruptcies of entities other than banks.[8] Hirsch Aff. ¶ 12. The Ufficio is not a citizen of the United States nor was it created under the laws of any third country. Beretta Piccoli Aff. ¶ 2. Thus, the Ufficio is a political subdivision or an agency of Switzerland, a foreign state.

The Commissione, which is merely a title conferred upon three individuals by

---

**6.** Plaintiffs do not provide any proof of Swiss law. Defendants provide both an affidavit from a Swiss law professor, Professor Alain Hirsch, as well as a letter from the Swiss Embassy. Fed. R.Civ.P. 44.1 makes the determination foreign law a question of law and one which a court can consider using any relevant material whether submitted or not. Although one might expect that after a year of extensive and expansive motion practice, plaintiffs would have provided the court with some material on this critical issue, it is unlikely that a motion to dismiss can be granted simply because plaintiffs failed to provide any proof of foreign law. *See Vishipco Line v. Chase Manhattan Bank,* 660 F.2d 854 (2d Cir.1981).

**7.** Aside from "commercial activity," other exceptions to the immunity conferred by the FSIA include: waiver by a foreign state; property

present in the United States taken in violation of international law; arbitration agreement between the parties; and, various admiralty proceedings.

**8.** Plaintiffs stated in their brief: "Defendant Ufficio ... is an administrative unit of the Canton of Ticino responsible for administering bankruptcy matters." Pltffs' Mem. at 12. The plaintiffs have shown no evidence that the Ufficio was involved in any manner in the liquidation of ICB's assets. They have only asserted that in 1993, four years after the completion of the liquidation, Muhammad found documents related to the liquidation in the Ufficio's offices. Perhaps the only reason that the entity was sued is that, unlike the Commissione and the ICB, it is the only body in existence today.

the Ticino Court of Appeals under Swiss banking law, is charged with the specific task of liquidating a bank in bankruptcy pursuant to the Court of Appeals's supervision. Hirsch Aff. ¶ 14. "The FSIA does apply to individuals when they are sued in their individual capacity." *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990); *Kline v. Kaneko*, 685 F.Supp. 386, 389 (S.D.N.Y.1988). The individual members of the Commissione are not citizens of the United States nor was the Commissione established under the laws of a third country. Beretta Piccoli Aff. ¶ 2. Consequently, unless an exception to the FSIA applies, both the individual members of the Commissione and the Ufficio cannot be sued in United States' courts pursuant to the FSIA. 28 U.S.C. § 1604.

### (b) the "commercial activity" exception to immunity

Plaintiffs maintain that the "commercial activity" exception to the FSIA does apply in this instance. Section 1605(a) provides:

A foreign state shall not be immune from the jurisdiction of courts of the United States or the states in any case ...

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

A "commercial activity means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Congress's primary concern in creating the exception to the FSIA was to provide a party injured by a commercial act of a foreign sovereign access to United States's courts. *Texas Trading & Milling Corp. v. Fed'l Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981), *cert. denied,*

454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

■ If the foreign state is engaged in an activity which can be performed by an individual citizen, then the activity is generally considered commercial. *Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994). In *Drexel*, plaintiffs brought suit against the Emirate of Dubai, United Arab Emirates and the Committee of Receivers for A.W. Galadari, for its alleged mishandling of plaintiffs' collateral when it liquidated the insolvent Dubai bank. The Committee of Receivers in *Drexel* is similar to the Commissione. It was comprised of four Dubai citizens; it was established by the government of Dubai; it had the authority to liquidate the bank's assets and bring and defend actions on behalf of individual who controlled the bank. *Id.* at 319. The Court of Appeals found that FSIA barred suit against the defendants because the Second Circuit found that no "direct effect in the United States occurred 'in connection with' a commercial activity." *Id.* at 330.

Plaintiffs misinterpret completely the majority opinion in *Drexel*, arguing that it held that the Committee of Receivers were engaging in commercial acts. Pltffs' Mem. at 55. This is simply not the holding of the Second Circuit. To the contrary, the Court of Appeals made it clear that it was not determining whether the actions of the Committee of Receivers constituted commercial activity. *Id.* at 329. In fact, Chief Judge Newman dissented for this reason, expressing his concern about the good faith of the Committee of Receivers, and argued that the majority had excluded the possible applicability of the "commercial activity" exception too quickly. *Id.* at 331.

Plaintiffs also assert that the Commissione is accountable for ICB's actions. They cite no authority for that proposition; nor do they offer any expert opinion to that effect. The affidavit of the defendant's expert, Professor Alain Hirsch, a professor of commercial law at the University of Geneva Law School, says unequivocally that the Commis-

sione is not a successor in interest to the bank nor does it assume any of the liabilities of ICB. Hirsch Aff. ¶¶ 20, 21. "All Commissiones act in a public capacity and must report to the court that appointed them." Ltr. from Swiss Embassy to Court, dated 1/22/96, at 2.

▮ Just as a trustee in bankruptcy in the United States is not a successor-in-interest to a debtor, so, too, the Commissione was not a successor-in-interest to ICB.[9] In *FDIC v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir.1995), the Court of Appeals held: "A receiver, like a bankruptcy trustee . . . does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct, nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects." *Id.* at 19.

▮ Here, the activities at issue—the liquidation of a bankrupt bank by a court appointed and monitored Commissione—are sovereign in nature. They cannot be performed by an individual citizen. As previously mentioned, the Second Circuit in *Drexel* did not specifically determine if the activities were commercial. However, it stated that "[e]ven the depiction of these activities as 'commercial' is, however, suspect." *Id.* at 329, n. 3. "Merely to attempt to collect and liquidate the assets of a debtor is not to carry on its business in any proper sense of the term." *In re Beck Indus.,* 725 F.2d 880, 887 (2d Cir.1984), citing *Austrian v. Williams,* 216 F.2d 278, 285 (2d Cir.1954), *cert. denied,* 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 744 (1955).

Despite a year of preparing for this motion, during which the parties compiled more than three thousand pages of documents and affidavits, and despite the parties' access to ICB documents at the Ufficio and plaintiffs' apparent knowledge of much of the Commissione's activities in Venezuela, plaintiffs have not pointed to any evidence that the Commis-

sione was doing anything other than winding up the activities of the bank. Dr. Tognola, the President of the Commissione from 1979 through the completion of the liquidation in 1989, explained that "significant assets of ICB were located in Venezuela. [Thus,] we were compelled to fight against public authorities and squatters for years before these assets were realized." Tognola Aff. at ¶ 8. Thus, it is evident that the Commissione or its members were not engaging in commercial activities, but were performing governmental acts, and are thus immune from suit under the FSIA here.

#### (c) the "direct effect" requirement

▮ Moreover, even if the "commercial activity" exception did apply to the Commissione, the "exception to the exception"—namely, the lack of a "direct effect" of the commercial activity in the United States—still would eliminate jurisdiction in United States' courts. Contrary to plaintiffs' assertions, the fact that plaintiffs are United States citizens who alleged that they suffered pecuniary losses does not establish a "direct effect" in the United States. Economic loss alone by an American party caused on a foreign government's soil is not enough to eliminate sovereign immunity even for commercial activities. *United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n,* 821 F.Supp. 1405, 1409 (D.Co.1993), *aff'd* 33 F.3d 1232 (10th Cir.1994), *cert. denied* — U.S. —, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995) ("Mere financial loss suffered by a plaintiff in the United States as a result of the action abroad of a foreign state does not constitute a 'direct effect' and therefore cannot by itself create subject matter jurisdiction under section 1605(a)(2).") (citations omitted); *Magnus Electronics, Inc. v. Royal Bank of Canada,* 620 F.Supp. 387, 390 (N.D.Ill.1985); H.Rep. No. 1487, 94th Cong., 2d Sess. 17, *reprinted in* 1976 U.S.S.C.A.N. 6604, 6616 (noting that a commercial act must have a "substantial contact" with the United States in order to "reflect a degree of contact be-

---

9. The plaintiffs do not provide any information to elucidate this crucial issue of foreign law. However, because pursuant to Fed.R.Civ.P. Rule 44.1 the district court can make a determination on foreign law based on any information, submitted

by the parties or not, the uncontradicted affidavit of defendants' expert fully supports the "finding" that under Swiss law the defendants are not successors in interest to ICB.

yond that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff."); *see also Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90 (2d Cir.1991), *vacated,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1991), *reaff'd,* 999 F.2d 33 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994) (affirming dismissal for lack of subject matter jurisdiction where the airplane of a United States partnership was detained in Nigeria, the financial loss to the United States partnership did not qualify as direct effect).

Despite these authorities, plaintiffs maintain that such a direct effect did occur here—again, however, misstating *Drexel's* holding, which specifically found that the Committee of Receivers was immune from suit because its activities lacked a "direct effect" in the United States. *Drexel,* 12 F.3d at 328–30. Plaintiffs attempt to distinguish *Drexel* by stating that in their proposed amended complaint ¶ 59 they specifically state that ICB or defendants mismanaged the trust causing a detrimental effect on them in the United States, rather than simply causing a loss of funds in Switzerland, as was the case in *Drexel.* However, since, like in *Drexel,* defendants' actions and plaintiffs' alleged funds were not in the United States, there was no direct effect in the United States.

Further, plaintiffs rely heavily upon *Texas Trading,* 647 F.2d at 309, which found a commercial activity having a direct effect on United States. In that case, the government of Nigeria actively sought and created contracts in the United States for the purchasing of cement and then breached the contract. There is no doubt that a contract to purchase goods and services in the United States is a commercial activity. *See* H.Rep. No. 94–1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615. However, in this instance, no contract to purchase goods and services between defendants and plaintiffs existed. Thus, the reliance on *Texas Trading* is misplaced because the essence of plaintiffs' claim relates to the role of the Commissione in gathering assets and adjudicating claims, which, as in *Drexel,* have no direct effect in the United States. Consequently, subject matter jurisdiction over this matter does not exist in a court of the United States.

### (2) Sanctions

 Defendants have also requested Rule 11 sanctions be imposed upon plaintiffs and their counsel for their distortion of the facts; their failure to make good faith arguments; and their unsupported, untrue statements in their memoranda. Defendants point out that the individual plaintiff and both Higgins brothers have all previously been convicted for various forms of fraud. Defs' Mem. at 3–5. The purpose of Rule 11 is to deter abusive or frivolous litigation. *See Murphy v. Cuomo,* 1996 WL 54231, *9, 913 F.Supp. 671, 682 (N.D.N.Y.1996). But invocation of Rule 11 is always discretionary with the court. Fed.R.Civ.P. 11(c). "Rule 11 sanctions should be imposed with caution." *Knipe v. Skinner,* 19 F.3d 72, 78 (2d Cir. 1994).

 The issue is a close one. This case has all of the tell-tale signs of a scam. Yet, plaintiffs did provide this court documentation indicating that a trust had probably been created and a letter from one member of the Commissione, albeit one he later recanted, indicated there was some substance to the complaint. Despite the fact that plaintiffs' complaint lacks subject matter jurisdiction and may have many other defects, the principal reason for not imposing sanctions is the failure of Campana, former counsel of ICB, to make copies of the GGT certificates he allegedly turned over to Muhammad in 1993. Campana Aff. at ¶ 12. Had he made copies of these documents and obtained a receipt, this litigation might well have been avoided, or, alternatively, would have been established as unquestionably fraudulent.

### Conclusion

Because the Commissione as well as its members and the Ufficio are either "agent[s]" or "instrumentalit[ies]" of a foreign state and none was involved in "commercial activit[ies]" having a "direct effect" in the United States, the Foreign Sovereign Immunity Act bars this action from being litigated in the courts of the United States as subject matter jurisdiction does not exist. 28 U.S.C. §§ 1603, 1605. Since this defect can-

not be remedied by any amended complaint, leave to file one is denied. Defendants' request for Rule 11 sanctions is also denied.

SO ORDERED.